# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____  )
                                     )
UNITED STATES OF AMERICA,            )
                                     )
   v.                                )   Criminal Case No. 17–46 (RBW)
                                     )
KASSIM TAJIDEEN,                     )
                                     )
           Defendant.                )
_____  )

## MEMORANDUM OPINION

This matter is before the Court on defendant Kassim Tajideen's Motion for Pretrial Release ("Def.'s Mot."), ECF No. 58.[1] Upon consideration of the parties' submissions[2] and oral arguments presented at the motion hearing held on February 1, 2018, and at the status conference held on February 16, 2018, the Court concludes that it must deny the defendant's motion.[3]

---

[1] On March 24, 2017, the defendant made an initial appearance before Magistrate Judge Robin Meriweather, who granted the government's request for the defendant's temporary detention. See Minute Entry (Mar. 24, 2017). Thereafter, on March 29, 2017, the defendant appeared before the undersigned for a detention hearing, in which he conceded to his detention without prejudice. See Minute Entry (Mar. 29, 2017). On May 18, 2017, after hearing argument and concluding that the defendant was a flight risk, the Court orally denied the defendant's first motion for pretrial release, see Minute Entry (May 18, 2017), which in large part presented to the Court a similar package of proposed bail conditions in support of the defendant's request for release pending his trial, see Motion for Pretrial Release, ECF No. 20.

[2] In addition to the defendant's motion, the Court considered the following submissions in rendering its decision: (1) the Government's Opposition to Defendant's Second Motion for Pretrial Release ("Gov't's Opp'n"); (2) defendant Kassim Tajideen's Reply in Support of His Motion for Pretrial Release ("Def.'s Reply"); (3) the Government's Supplement to Opposition to Defendant's Second Motion for Pretrial Release ("Gov't's Supp."); (4) defendant Kassim Tajideen's Response to Government's Supplement to Opposition to Defendant's Motion for Pretrial Release ("Def.'s Resp."); and (5) the Government's Notice ("Gov't's Notice"), ECF No. 97.

[3] "[M]indful" of the Court's prior oral ruling, Def.'s Mot. at 1, the defendant's current motion seeks pretrial release pursuant to "a new release package" that includes a combination of conditions that, according to the defendant, will provide the Court with "even greater assurance that he will not flee," id. at 2. Therefore, given this allegation as well as the defendant's representations at the February 1, 2018 motion hearing and at the February 15, 2018 status conference, it appears to the Court that the defendant does not seek to challenge the Court's conclusion that he is a flight risk, but rather whether a combination of conditions will reasonably assure his appearance at trial. Accordingly, the Court's analysis will focus only the proposed release conditions. However, to the extent that the defendant does seek to challenge the Court's determination that he poses a flight risk, as the government notes, "the defendant presents no new facts or changed circumstances," Gov't's Opp'n at 1, that would provide a basis for altering the Court's conclusion.

## I.     BACKGROUND

In an eleven-count Superseding Indictment filed on February 15, 2018, the government charges the defendant with the federal offenses of (1) conspiracy to conduct unlawful transactions and cause United States persons to conduct unlawful transactions with a Specially-Designated Global Terrorist ("SDGT"), and to defraud the United States by dishonest means; (2) nine unlawful transactions with a SDGT and aiding and abetting and causing an act to be done; and (3) conspiracy to commit money laundering.  See generally Superseding Indictment, ECF No. 89.  In short, the defendant is charged with allegedly "continu[ing] to conduct business with [United States] entities through a large network of businesses with ever-changing names run by a relatively small group of personnel, effectively hiding his own involvement in the transactions," despite his designation as an SDGT by the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC").  Government's Opposition to Defendant's Motion for Pretrial Release at 3, ECF No. 22.

The defendant, who is sixty-two years old, is purportedly "an extremely wealthy businessman with vast overseas holdings."  Gov't's Opp'n at 3.  According to the government, he is a citizen of Belgium, Sierra Leone, and Lebanon, and has no significant ties to the District of Columbia or the United States.  See id. at 4.  The government also represents that he has a "prior foreign felony conviction related to forgery of documents" and faces a "potential lengthy sentence" if convicted in this case.  Id. at 2.

The defendant proposes the following pretrial release conditions:  (1) the defendant "will post a two-million dollar cash bond," Def.'s Mot. at 7; (2) he is willing to "be fitted with a security bracelet and be subject to [the] Pretrial Service [Agency's] ("Pretrial Services") electronic home monitoring program," id. at 6; (3) he "will agree not to obtain a passport," id. at

7; and (4) his brother-in-law, who is a United States citizen, will "put up his home as security," id. at 5. The defendant also states that he "will agree to reside in an apartment that will be secured and monitored" by Guidepost Solutions LLC ("Guidepost"), a security company, id., and "will agree to travel from the secured residence only for court appearances or when otherwise approved in advance by [ ] Pretrial Services," id. at 6. In terms of the defendant's monitoring, Guidepost proposes the following surveillance measures: (1) monitoring of the defendant by two armed guards, id. at 5, "who will be inside the apartment [twenty-four] hours [per] day"; (2) monitoring of "[t]he apartment's exterior doors and windows . . . by sensors"; (3) monitoring by "two individuals outside the apartment [twelve] hours [per] day who will conduct counter-surveillance"; and (4) monitoring of the apartment "by a video feed that will be monitored and recorded," id. at 6. In addition, "Guidepost will not permit [the defendant to have] any visits that are not pre-approved" by Pretrial Services. Id. And, when the defendant is traveling, Guidepost will secure his travel by having: "(1) a third security professional . . . drive[ ] a security vehicle; (2) a fourth security professional [ ] remain behind at the residence to maintain a security presence . . . ; (3) the vehicle [used to transport the defendant] be outfitted with GPS tracking; and (4) . . . [the defendant blocked from] access to communication devices." Id.

## II. STANDARD OF REVIEW

"The Bail Reform Act requires release of a defendant prior to trial unless a judicial officer determines, after a hearing, that 'no condition or combination of conditions will reasonably assure the appearance of the person[.]'" United States v. Bikundi, 47 F. Supp. 3d 131, 133 (D.D.C. 2014) (alteration in original) (quoting 18 U.S.C. § 3142(e)(1) (2012)); see also United States v. Hassanshahi, 989 F. Supp. 2d 110, 113 (D.D.C. 2013) ("Our system of criminal

justice embraces a strong presumption against detention. In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." (first quoting United States v. Hanson, 613 F. Supp. 2d 85, 87 (D.D.C. 2009); then quoting United States v. Salerno, 481 U.S. 739, 755 (1987))). In evaluating whether any combination of conditions exists that will reasonably assure the defendant's appearance at trial, courts must consider "the available information concerning" the following four factors:

> (1) the nature and circumstances of the offense charged, . . . ;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including . . . the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, . . . criminal history, and record concerning appearance at court proceedings; and . . .
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

Because "the government seeks pretrial detention only on the ground that the defendant poses a flight risk, it must make that showing by a preponderance of the evidence." United States v. Hong Vo, 978 F. Supp. 2d 41, 42 (D.D.C. 2013) (citing United States v. Xulam, 84 F.3d 441, 442 (D.C. Cir. 1996)). "That preponderance must, of course, go to the ultimate issue: that no combination of conditions—either those set out in the Bail Reform Act or any others that the . . . judge might find useful—can reasonably assure that the defendant will appear for trial." Xulam, 84 F.3d at 442 (citation and internal quotation marks omitted).

### III.   ANALYSIS

The government maintains that pretrial detention is required because "there are no conditions or combination of conditions that can reasonably assure the defendant's presence for

trial in this matter." Gov't's Opp'n at 2. Specifically, the government contends that "[a]fter a review of [the defendant's] proposed conditions of release, an analysis of the [relevant] factors [identified in the Bail Reform Act] strongly favors the defendant's continued detention." Id. at 7. The Court agrees.

Initially, the Court finds no reason to disturb either its prior analysis of the § 3142(g) factors that it must consider in determining whether pretrial detention is appropriate or its conclusion that those factors favor the defendant's detention pending trial. See generally Transcript of Motions Hearing ("May 18, 2017 Mot. Tr.") (May 18, 2017), ECF No. 24. Based on the available information concerning those factors, the parties' briefing on the defendant's first motion for pretrial release, and the arguments made at the motion hearing held on May 18, 2017, the Court concluded that,

> under the circumstances[,] considering the serious nature of the charges that [the defendant] faces, [ ] his lack of ties to this community and also [the United States], and his financial means[,] even though some of those funds may not be available to him[,] . . . the government has in fact shown that no condition or combination of conditions would in fact ensure [the defendant's] appearance before this Court for future proceedings.

Id. at 27:5–17. In his pending motion for pretrial release, the defendant neither challenges nor asserts new arguments or facts that would alter the Court's prior conclusion. See generally Def.'s Mot.[4]  Therefore, the Court remains committed to its prior analysis of the § 3142(g)

---

[4] In his motion, the defendant argues that, since the Court previously denied his first motion for pretrial release, "it has become clear that the [g]overnment lacks evidence that [he] provided funds to Hizballah," a terrorist organization. Def.'s Mot. at 2. The defendant further contends that "the Court must presume, in light of the government's failure to provide any evidence to support [his] designation, that the charges against [him] arise only because the United States unlawfully (i.e., without basis in fact) designated [him] as a Hizballah financer." Id. Therefore, according to the defendant, the "Court now must disregard any allegation of any link to any terrorist group." Id. However, in the Court's assessment of § 3142(g)'s factors, it did not consider any evidence of the defendant's purported ties to Hizballah or his alleged actions of providing funds to Hizballah. See generally May 18, 2017 Mot. Tr. And, since the inception of this case and throughout the briefing and multiple hearings held on the defendant's various motions to compel discovery, the government has unwaveringly argued that this case is not about the defendant's designation as a SGDT by OFAC, but rather about the defendant's purported actions after receiving such designation. See, e.g., Transcript of Motions Hearing ("Feb. 1, 2018 Mot. Tr.") at 15–17 (Feb. 1,
(continued . . .)

factors and its conclusion that those factors supports pretrial detention in this case.

Notwithstanding this determination, the defendant now argues that his new bail package "proposal satisfies every condition that the government states is necessary to guarantee his appearance, going well[ ]beyond the actual standard of providing a reasonable assurance." Def.'s Reply at 3 (emphasis removed). As the defendant concedes, however, his newly proposed bail package presents only two additional conditions that were not included in his prior bail package that the Court previously rejected. See id. at 3–5.[5] Those two additional conditions are the posting of his brother-in-law's home as a security and the selection of Guidepost as an alternative security company to secure and monitor his detention, id. at 4, neither of which convinces the Court that there is a combination of conditions that would reasonably ensure the defendant's appearance for future proceedings.

"[T]he Court finds that the posting of [the defendant's brother-in-law's] home as security would not provide a reasonable assurance of [the defendant's] appearance at trial." United States v. Anderson, 384 F. Supp. 2d 32, 41–42 (D.D.C. 2005). Although the Court is unaware of the value of the defendant's brother-in-law's home, the information before the Court gives it ample

---

(. . . continued)
2018), ECF No. 87 (arguing that case law prevents the defendant from collaterally attacking OFAC's designation in this criminal trial); id. at 17:3–6 (noting that the indicted charges are based on the defendant allegedly "go[ing] forward and . . . violat[ing] [] regulations despite the fact that he was still challenging as he says the OFAC determination"). The evidence identified by the defendant would amount to an attack on that designation, which the Court agrees the defendant may not do during a trial based on what he is accused of having done. Moreover, the government has consistently repeated that it will not seek to introduce at trial any evidence of the defendant's ties to or financial support provided to Hizballah. See Transcript of Motions Hearing at 9:18–22 (Aug. 28, 2017), ECF No. 37 ("[The government] would not presume to come in and try to prove that the defendant was materially supporting H[i]zb[a]llah in a case where he[ is] not charged with materially supporting H[i]zb[a]llah."). In any event, the Superseding Indictment does not contain any allegation of the defendant's purported ties or financial support of Hizballah. See generally Superseding Indictment. Accordingly, the Court finds the defendant's Hizballah related argument unpersuasive.

[5] Because the Court has already evaluated and determined that the other conditions in the defendant's proposed bail release package are not sufficient to reasonably assure his appearance at trial, see generally May 18, 2017 Mot. Tr., it will consider only the two new proposed modifications and whether they tip the scales in favor of the defendant's pretrial release.

"reason to believe that [the defendant] has access to financial resources far in excess of the value of his [brother-in-law's] house, with which he might provide for [his brother-in-law] . . . in the event that [his] house is seized." Id. at 42; see also Gov't's Opp'n at 8 (asserting that the defendant's offer to post his brother-in-law's home "likely pales in comparison with the defendant's vast wealth, which allows him to offer to post a [two] million [dollar] bond to secure his own appearance"); Feb. 1, 2018 Mot. Tr. at 77:7–23 (the government representing that its investigation has "uncovered hundreds of millions of dollars in transactions that [the defendant's] companies transacted over a period of approximately five years"). Thus, while the support of his brother-in-law is commendable, "[t]he Court simply has no basis to conclude that the possible loss to [the defendant's brother-in-law] on the bond would impact [the defendant] sufficiently to ensure [his] presence at trial." Hong Vo, 978 F. Supp. 2d at 46 (discussing a defendant's new proposed condition of release of having her sister "post her condominium apartment . . . , in which [the defendant's] sister and niece live, and in which [the defendant's] sister ha[d] $50,000 in equity, as bond").

Furthermore, the defendant proposes using Guidepost as an alternative security company to monitor his pretrial activities in an agreed-upon apartment and to secure his appearance for trial and other court proceedings. See Def.'s Reply at 4 (noting that Guidepost was selected "specifically to address this Court's expressed concerns about accountability" regarding the first proposed security company). As support for why this condition would reasonable ensure his presence at trial, the defendant argues that

> Guidepost is a highly respected and reputable company that is run by individuals with impeccable credentials. Courts have approved [Guidepost] to secure people pretrial, and each of those individuals has made every required appearance. The government, including the [United States] Department of Justice, has also appointed Guidepost to monitor the conduct of organizations. [Thus, i]f [he] were to flee while under Guidepost's supervision, it would substantially harm Guidepost

7

by damaging its reputation and limiting its ability to secure future work. Id. at 4–5 (citations omitted). The government in response asserts that the defendant's proposal to use Guidepost as a third-party custodian to monitor and to secure his presence for court proceedings should be denied for two reasons. See generally Gov't's Supp. Primarily, the government contends that denial is warranted for the same reasons that other courts have rejected identical proposals by other defendants to use Guidepost to secure their appearances. See id. at 2–5.[6] Additionally, according to the government, "Guidepost's repeated failures to enforce the [ ] security measures" imposed by a court that decided to grant pretrial release and place a defendant in that case in Guidepost's custody "should [not] give this Court confidence that this combination of conditions will reasonably assure this [d]efendant's presence at future proceedings." Id. at 6.

Although not addressed in this jurisdiction, other courts have considered whether the use of Guidepost and its security measures would present a set of conditions that would reasonably secure a defendant's presence at future court proceedings.[7] The Court finds United States v. Zarrab, Crim. Action No. 15-867 (RMB), 2016 WL 3681423 (S.D.N.Y. June 16, 2016) particularly instructive. In Zarrab, the district court in the Southern District of New York considered the bail application of Mr. Zarrab, who was "charged with [ ] orchestrating and conducting a scheme to allow sanctioned entities, and the government of Iran, to access the international financial networks, and especially the United States financial networks . . . specifically for the purpose of evading sanctions." 2016 WL 3681423, at *1 (second omission in

---

[6] Because the government did not insert page numbers on its supplemental opposition, the page numbers cited by the Court when referencing the government's supplemental opposition are the page numbers automatically generated by the Court's ECF system.

[7] Neither party has presented to the Court any cases in this jurisdiction, nor is the Court aware of any, in which a defendant was granted pretrial release upon the condition that he be detained by a privately retained security company that would be responsible for monitoring his activities and securing his presence for future proceedings.

original).  After considering the available information concerning the § 3142(g) factors, the court concluded "by a preponderance of the evidence that Mr. Zarrab," id. at *9, "a wealthy and successful international businessman[,] an experienced international traveler . . . [, and] a dual national of Turkey and Iran, . . . [with] no ties to New York or to the United States," id. at *1, was "a flight risk," id. at *9.  The court then proceeded to "determine[] whether there [we]re bail conditions which w[ould] 'reasonably assure [Mr. Zarrab's] appearance'" at trial, including Mr. Zarrab's proposal to use Guidepost's "'24/7' privately funded armed guard feature." Id. (citations omitted).

Ultimately, the court concluded that Mr. Zarrab's proposal to use Guidepost "d[id] not reasonably assure [Mr. Zarrab's] appearance . . . in future proceedings," id. at *10, for the following reasons.  At the outset, the court acknowledged that Mr. Zarrab's "proposal d[id] not appear to contemplate 'release' so much as it describe[d] a very expensive form of private jail or detention." Id. (citing 18 U.S.C. § 3142); see also id. ("There is nothing in the Bail Reform Act that would suggest that a defendant . . . has a statutory right to replicate or construct a private jail in a home or some other location.  The Bail Reform Act address[es] conditions of release, not conditions of detention.  Of course, the Act clearly allows for forms of home detention less restrictive than jail.  However, once the home detention becomes so restrictive (including with the use of private security guards) that it simply replicates a jail, it is highly questionable whether the Bail Reform Act contemplates 'release' in that context." (omission in original) (quoting United States v. Valerio, 9 F. Supp. 3d 283, 293–94 (E.D.N.Y. 2014))).  The court then reasoned that the proposed use of Guidepost "substitutes judicial oversight and management for (more appropriate) reliance upon trained, experienced, and qualified professionals from the [United States] Bureau of Prisons and the [United States] Marshals Service." Id.; see also id. at *11–12

9

(holding that "judicial involvement [was] inherent in the proposed privately funded armed guard regime" because the court could be asked to "decide whether the private security guards should be armed or unarmed[,] . . . determine the appropriate level of force that may be used to secure Mr. Zarrab . . . [, and] to make attorney/client determinations for Mr. Zarrab"). The court also found Mr. Zarrab's proposal to use Guidepost unreasonable because "it raise[d] serious issues of liability surrounding the use of force against [Mr. Zarrab] and persons who may interact with him." Id. at *12 (questioning whether signed "waivers from defendants permitting the 'future use of reasonable force' against them" were valid, enforceable, and reasonable); see also id. ("There are some conditions that are simply not appropriate to be contracted out, and detention under armed guard would seem to be one of those." (quoting Valerio, 9 F. Supp. 3d at 295)). Lastly, the court determined that Mr. Zarrab's proposal to use a "privately funded armed [security company was] unreasonable because it helps to foster inequity and unequal treatment in favor of a very small cohort of criminal defendants who are extremely wealthy, such as Mr. Zarrab." Id. at *13 (citing cases for the proposition that distinguishing defendants based on their financial situations is entirely inapposite to long-standing legal precedent); see also id. ("[I]t is contrary to underlying principles of detention and release on bail that individuals otherwise ineligible for release should be able to buy their way out by constructing a private jail, policed by security guards not trained or ultimately accountable to the government, even if carefully selected." (quoting Borodin v. Ashcroft, 136 F. Supp. 2d 125, 134 (E.D.N.Y. 2001))).[8]

Concurring with and adopting in full the rationale and analysis provided by the court in

---

[8] The government also cites United States v. Zhong, Crim. Action No. 16-614 (DLI) (E.D.N.Y. Jan. 3, 2017) as an additional case where the district court concluded that the use of Guidepost would not reasonably assure the defendant's appearance at future proceedings. See Gov't's Supp. at 4–5. On appeal, the United States Court of Appeals for the Second Circuit affirmed the district court's decision to deny the defendant's request for pretrial release. See generally United States v. Zhong, 682 F. App'x 71 (2d Cir. 2017).

Zarrab, this Court likewise is not convinced that the defendant's bail proposal to include the engagement of Guidepost to monitor his pretrial activities and to secure his appearance at future court proceedings in this case qualifies as a combination of conditions that will reasonably ensure the defendant's presence at those proceedings.[9] Although the defendant adamantly contends that he "should not be prevented from obtaining pre-trial release due to [his] wealth," Def.'s Mot. at 10; see also Def.'s Resp. at 4 ("The Bail Reform Act contains no bar on the use of personal resources to secure conditions of release."), the Court finds that permitting a vastly wealthy defendant "to basically buy [his] way out of pretrial detention by coming up with a plan consistent with what is being proposed here" to be wholly "inconsistent with [the purpose and] the reason for the adoption of the Bail Reform Act[,] which took the issue of money out of the equation as to whether someone should be detained or not," May 18, 2017 Mot. Tr. at 24:4–15; see also Allen v. United States, 386 F.2d 634, 637 (D.C. Cir. 1967) ("The Congress finds that— (2) Persons reasonably expected to appear at future proceedings should not be deprived of their liberty solely because of their financial inability to post bail; (3) Respect for law and order is diminished when the attainment of pretrial liberty depends solely upon the financial status of an accused. . . . The purpose of [the Bail Reform] Act is to revise the practices relating to bail to assure that all persons, regardless of their financial status, shall not needlessly be detained pending their appearance to answer charges, to testify, or pending appeal, when detention serves

---

[9] The Court acknowledges that one district court has selected Guidepost to monitor a defendant and to secure his appearance at future court proceedings. See Gov't's Supp. at 5–6 (discussing United States v. Seng, Crim. Action No. 15-706 (VSB) (S.D.N.Y. 2016)). The defendant does not appear to implore the Court to accept the Seng court's reasoning in approving the use of Guidepost, see generally Def.'s Mot; Def.'s Reply, and the parties dispute Guidepost's success in monitoring that defendant's activities prior to, during, and after the defendant's trial and securing his appearances for court proceedings, compare Gov't's Supp. at 5–6, with Def.'s Resp. at 1–3. Regardless, this Court is not convinced that the use of Guidepost in Seng, which was the consequence of that court's discretion, is applicable here, particularly because that court imposed approximately twenty-seven highly restrictive conditions on the defendant, see generally Order, United States v. Seng, Crim. Action No. 15-706 (VSB) (S.D.N.Y) (Oct. 23, 2015), ECF No. 53; which is extensively more than the defendant proposes in this case, see generally Def.'s Mot.

neither the ends of justice nor the public interest." (quoting the "findings of legislative intent" of the Bail Reform Act)).

Moreover, although the Bail Reform Act specifically removed from consideration a defendant's financial status in regards to the posting of bail to secure one's release, it explicitly requires courts to consider the defendant's financial resources in determining whether there is a set of conditions that would reasonable assure his appearance. See 18 U.S.C. § 3142(g)(3)(A). Thus, contrary to the defendant's contention, see Def.'s Resp. at 4 ("[T]he government most certainly cannot whipsaw [him] by using his wealth to speculate that he has the resources to flee and then cry foul when he attempts to use the same wealth to alleviate the government's purported concerns."), it is more than appropriate for the Court to consider the defendant's vast wealth in determining the reasonableness of his proposal. And as the government aptly asserts, "the defendant's extreme wealth affords him opportunities and influence which make any pretrial release as proposed by the defendant problematic." Gov't's Opp'n at 5 (citation and internal quotation marks omitted). During the February 1, 2018 motion hearing, a Guidepost representative informed the Court that the individuals selected to monitor the defendant's pretrial activities and to secure his appearance for future proceedings would work "somewhere between [thirty-six] to [forty-eight] to [sixty] hours [per] week," Feb. 1, 2018 Mot. Tr. at 68:22, and would be paid by the defendant at a rate of "probably [forty-nine] to [sixty dollars] [per] hour," id. at 65:18. While the Court has no reason to believe that the individuals selected for the defendant's security detail would intentionally violate federal law and assist the defendant in fleeing the Court's jurisdiction, it nonetheless is mindful of the power of money and its potential to corrupt or undermine laudable objectives. And although these realities cannot control the Court's ruling, they also cannot be absolutely discounted or ignored.

What is compelling is that the Court is not persuaded that the potential consequences Guidepost theorizes it would suffer if the defendant escaped its custody is sufficient to ensure the defendant's presence at further court proceedings. The defendant argues that Guidepost would face significant harm in the form of reputational damage and loss of future employment opportunities if it did not successfully secure his appearance at future court proceedings. See Def.'s Mot. at 9–10. While these potential adverse consequences are presumably real, they do not ensure that "somehow [the defendant would not be] able to make his escape" without any intentional or negligent conduct by Guidepost employees, and in that event, there is no way how Guidepost, a private security company, could be held accountable for the escape by the court or the government. May 18, 2017 Mot. Tr. at 8:16–17; see also id. at 11:9–16 ("[T]here would be no accountability for the defendant's own private security firm. There would also be almost no recourse for the United States if the defendant were to escape to Lebanon[,] which is his home[,] because there[ is] no [ ] extradition treaty with Lebanon. So in essence[,] if he can do that[,] he puts himself in almost exactly the same position as he was before he was brought to the United States.").[10]

---

[10] The government reiterates that while the defendant was detained in Morocco and before he was extradited to the United States, there was a twenty million dollar bounty "for anyone who could obtain the defendant's release." Gov't's Opp'n at 9 (noting that it raised this argument during the Court's consideration of the defendant's first motion for pretrial release). The defendant in response contends such "[v]ague, unspecific, and threadbare rumors are not remotely sufficient to support detention." Def.'s Mot. at 12. Given the lack of information the Court had regarding the government's representation, it ordered the government to submit an affidavit attesting to the legitimacy of the alleged bounty, see Order at 1–2 (Feb. 1, 2018), ECF No. 79, which the government subsequently submitted, see generally Affidavit of Patrick Picciano ("Picciano Aff.") (Feb. 8, 2018), ECF No. 81. However, as the defendant correctly notes, "[t]he affidavit provides little more than what the government provided previously" to the Court in its submissions and during oral arguments, see Defendant Kassim Tajideen's Objection to Affidavit of Patrick Picciano at 1, ECF No. 85, and therefore does not assist the Court in any meaningful manner. Nonetheless, considering the government's representations of an alleged bounty in connection with its other available evidence regarding the § 3142(g) factors, the Court would be amiss not to acknowledge the possibility of such a bounty given the defendant's significant wealth, and the serious implications that would occur if there was an attempt to secure the defendant's release, let alone if that attempt was successful. But again, this potential alone cannot be the basis for denying the defendant's motion.

In sum, all of the information available regarding the § 3142(g) factors weighs in favor of detention.  See Gov't's Opp'n at 7–8 (noting the gravity of the offense charged, the lengthy prison term the defendant faces if convicted, the strength of the government's evidence, the defendant's immense wealth, his several foreign citizenships, including citizenship in a country that does not have an extradition agreements with the United States, the defendant's lack of meaningful ties to the District or anywhere else in the United States, and his prior foreign conviction involving the use of forged documents "militate strongly against the defendant's release").  And, the Court is not convinced, considering these factors, that the defendant's new bail package incorporating the additional posting of his brother-in-law's home and the use of Guidepost will reasonably assure his appearance at all future court proceedings.

## IV.    CONCLUSION

For the foregoing reasons, the Court concludes that the government has demonstrated by a preponderance of the evidence that no combination of conditions can reasonably assure the defendant's presence for future court proceedings in this matter, and therefore, pretrial detention is required.  Accordingly, the Court denies the defendant's motion for pretrial release.[11]

---

[11] It appears to the Court that the defendant's second motion for pretrial release is predicated, at least in part, on the purportedly unfavorable dietary options, his medical condition, and the medical care he is not receiving at his current detention facility.  See Def.'s Mot. at 1 (asserting that (1) he "is unable to obtain the diet required by his religion and survives on a diet of rice from the kitchen and canned tuna and sardines which he purchases"; (2) "[h]e has lost twenty pounds of body weight"; (3) he has fluctuating "blood pressure and heart rate[s]"; (4) he has no available dental treatment for the implants for his front teeth that have fallen out; and (5) his lawyers have to travel two hours roundtrip to meet with him); see also id. ("It is unnecessary and violates the Bail Reform Act to require him to be incarcerated, especially in these circumstances, while he awaits trial.").  The Court appreciates that the parties disagree on the veracity of the alleged conditions.  See Gov't's Opp'n at 9–11.  In any event, in an attempt to address the defendant's allegations, at the February 16, 2018 status conference, the Court informed the parties that it was looking into whether the defendant could be transferred from the Stafford Regional Jail, his current detention facility, to the Correctional Treatment Facility ("CTF") located here in the District.  However, the United States Marshals Service recently advised the Court that the defendant would not qualify for detention at CTF.

**SO ORDERED** this 15th day of March, 2018.[12]

REGGIE B. WALTON  
United States District Judge

---

[12] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.